# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA ANN GREK,<br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner<br>of Social Security,<br>    Defendant. | )<br>)<br>)<br>)<br>) 1:14-CV-228 Erie<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

June 25, 2015

## I.  Introduction

Patricia Ann Grek ("Plaintiff") has filed this action for judicial review of the decision of the Acting Commissioner of Social Security, which denied her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, 1381-1383. Pending before the Court are the parties' cross-motions for summary judgment. ECF Nos. 6, 10. The motions have been fully briefed and are ripe for disposition. ECF Nos. 7, 11. For the reasons that follow, the Acting Commissioner's motion will be **GRANTED**, and Plaintiff's motion will be **DENIED**.

## II.  Background

Plaintiff was born on May 8, 1964.[1] (R. 76). She is a high school graduate, with past relevant work experience as a home healthcare aide, housekeeper, laundry folder, and assembly worker. (R. 77, 99). However, she has not worked since June 1, 2008. (R. 79). She initially alleged disability as of that date due to anxiety, depression, and bipolar disorder. (R. 138, 298).

---

1.  As of her alleged onset date, Plaintiff was classified as a "younger person" under the regulations. 20 C.F.R. § 404.1563(c) ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.").

1

At the hearing, though, she agreed to amend her alleged onset date to January 12, 2011. (R. 50, 326). Plaintiff met the insured-status requirement through December 31, 2011. (R. 52).

### A. Treatment Records

Plaintiff has a long history of mental health issues, including diagnoses of bipolar disorder, depression, and borderline personality disorder. She has been hospitalized on several occasions, dating back to several years before her alleged onset date. She also has a history of alcohol abuse, though she has been sober for several years.

Around the time she stopped working, Plaintiff was seeing Joan Rowland, C.R.N.P., and the staff at Safe Harbor Behavioral Health ("Safe Harbor") to manage her psychotropic medications, which at the time included Wellbutrin, Seroquel, Zoloft, and Vistaril. (R. 341-363). She was reported to be doing well throughout 2008, with her GAF consistently assessed at 75. (R. 352-60). Her mental status examinations were also within normal limits. (R. 352-60). Plaintiff started to see a counselor at Safe Harbor in February 2009. (R. 351-55). During her intake interview, she told the counselor that she struggled with depression and had a history of negative experiences with mental health treatment. (R. 351-55). Her depression and anxiety continued throughout the remainder of 2009, and she continued to receive routine treatment from Safe Harbor. (R. 342-48). All the while, although Plaintiff reported that she had "stopped looking for a 'real job,'" she was cleaning houses to make some extra money. (R. 342). Throughout 2009, her GAF remained at 55. (R. 342-48).

Plaintiff was admitted to Millcreek Community Hospital ("Millcreek") on January 12, 2011, for a psychiatric evaluation. (R. 379). At intake, she reported that her dosage of Seroquel needed to be adjusted. (R. 379). She had reportedly been taking her medication improperly for about 10 days. (R. 379). Plaintiff was diagnosed with mood disorder, not otherwise specified,

and assessed a GAF of 26. (R. 380-81). She was voluntarily admitted to the psych unit, where she spent the next seven days. (R. 381). By the time of her discharge, Plaintiff's mood had improved, and she did not display any evidence of psychosis or delusions. (R. 377). She also denied experiencing hallucinations, anxiety, depression, thoughts of self-destructive behavior, suicidal ideation, and/or homicidal ideation. (R. 377). Her GAF score was 60. (R. 378). She was advised to continue seeking outpatient treatment after her discharge. (R. 378).

On February 14, 2011, Plaintiff underwent a psychiatric evaluation at Stairways Behavioral Health ("Stairways"). (R. 383-85). She recounted her lengthy history of psychiatric problems, but noted that her condition had been stabilized with Seroquel. (R. 384). Although Plaintiff still reported "occasional paranoia," she "admit[ted] that [her condition] had improved" with medication. (R. 384). She noted that she was still working part-time cleaning houses. (R. 385). Upon examination, she was alert and oriented, pleasant, and cooperative. (R. 385). Her thought process was organized and relevant, and she denied suicidal and homicidal ideations, as well as hallucinations. (R. 385). Although she did not appear delusional, she did show some signs of paranoia and splitting behavior. (R. 385). Otherwise, she displayed average intelligence without any significant cognitive or memory impairment, and her mood was stable. (R. 385). Diagnoses of bipolar disorder and borderline personality disorder were confirmed, and she was assessed a GAF of 60. (R. 385).

Plaintiff followed-up at Stairways for medication checks throughout the rest of 2011. (R. 386-397). Mental status examinations were unremarkable during this period. (R. 386-397). Her mood was, for the most part, stable, but she did continue to experience depression. (R. 393). Also, at times she reported that Seroquel was making her tired. (R. 386-397). In April 2011, she was taken off Zoloft and prescribed Prozac. (R. 393). At her next appointment, Plaintiff reported

3

that Prozac seemed to help her mood, but she wanted to try a higher dose. (R. 394). Two months later, however, she reported no improvement in her depression. (R. 395). She also reported poor motivation and indicated that she had been isolating herself at times. (R. 395). As a result, her Prozac dose was increased. (R. 395). The next month, she reported depression, anxiety, poor energy, and low motivation, and she was prescribed Effexor, in place of Prozac. (R. 397).

Over the next few months, Plaintiff was described as "stable" on her medications and continued on the same regimen. (R. 421-24). By April 2012, however, Plaintiff reported that she was feeling "pretty low," and her mood was very unstable. (R. 425). She also reportedly felt irritable and lacked motivation. (R. 425). According to Plaintiff, Effexor was not working as well as it had been when it was first prescribed. (R. 425). At her next visit in late May 2012, though, Plaintiff reported that her mood improved. (R. 426). She also reported that she had been sleeping better. (R. 426). Her condition remained stable throughout the summer of 2012, and in August, she reported that her then-current medications had been helpful. (R. 427). Plaintiff underwent a psychiatric evaluation at Stairways on October 1, 2012. (R. 463). Her symptoms included paranoia, insomnia, and depression. (R. 463). She also reported feeling stressed because of her separation from her husband. (R. 463). Upon examination, Plaintiff's speech was fast, her thought process was tangential and slightly elevated, her mood was elevated, her judgment was fair to poor, and she displayed slight psychomotor agitation. (R. 464). Otherwise, the findings of the examination were normal. (R. 464).

On October 9, 2012, Plaintiff was voluntarily admitted to Millcreek. (R. 434). She had apparently stopped taking her medications and reported that she was feeling "extremely paranoid" and "seeing demons." (R. 434). She was assessed a GAF score of 28 during her intake interview. (R. 437). During her hospitalization, Plaintiff did not require any periods of seclusion

or restraint, but she did require frequent redirection. (R. 432). By October 10, her doctors noted that it had "become apparent that her psychotic symptomology was beginning to diminish . . . ." (R. 432). Two days later, Plaintiff indicated that she was ready to be discharged. (R. 432). Her doctors confirmed that "she was no longer psychotic and was not expressing any desire to harm herself or to harm others. (R. 432). Whenever she was discharged, she was instructed to follow up with her Stairways counselor and see her psychiatrist, Sean Su, M.D. (R. 433). Her GAF was assessed at 60 upon her discharge. (R. 433).

Approximately one week later, Plaintiff was readmitted to Millcreek's behavioral health unit – this time involuntarily. (R. 441). According to the 302 petition completed by the police, Plaintiff was found sitting on the railroad tracks with a train approaching her. (R. 441). She jumped off the tracks when the train was just five feet away. (R. 441). When Plaintiff was taken into custody, police found pictures of her dogs and a suicide note in her possession. (R. 441). Plaintiff remained in Millcreek until November 9, 2012. (R. 437). During her stay, she displayed extreme paranoia toward the hospital's staff and her doctors. (R. 438). At one point, she became delusional. (R. 438). She also harassed other patients. (R. 438). Eventually, however, she started to respond to her medication regimen and became more cooperative with staff, doctors, and her fellow patients. (R. 438). By the time of her discharge on November 9, she was alert and oriented times three and was pleasant and cooperative. (R. 439). She did not display suicidal or homicidal ideation, hallucinations, or paranoia; her mood was non-depressed; and she was assessed a GAF of 65. (R. 439). Once her doctors determined that she was not a danger to herself or others, she was referred to the Stairways Residential Treatment Facility for Adults ("RTFA"), where she was to continue her inpatient care. (R. 439).

Plaintiff was admitted to the RTFA on November 9 and discharged on November 31. (R.

5

457). During her discharge meeting, Plaintiff reported that she had been "feeling good," and her mental status examination was normal. (R. 456). Her husband, who was in attendance at the meeting, confirmed that "this is the best he has seen her do." (R. 456). Still, her GAF was assessed at 36. (R. 457).

Plaintiff had a medication check with Dr. Su at Stairways on December 4, 2012, just days after her discharge from the RTFA. (R. 468). She explained that she had been hospitalized because she had become "extremely unstable and manic after she stopped taker her medications as prescribed." (R. 468). At the time of this appointment, though, she reported "doing well," as her mood was stable. (R. 468).

Plaintiff had another medication check one month later, and she reported that she was not happy with her dose of Seroquel. (R. 470). Be that as it may, she again reported that her mood had been stable since her recent hospitalization. (R. 470). In particular, she denied experiencing depression or anxiety, along with suicidal and homicidal ideation and hallucinations. (R. 470). All facets of Plaintiff's mental status examination were normal. (R. 470). Her medication levels were adjusted, and she was told to return in two weeks. (R. 471).

Plaintiff followed up on January 18, 2013. (R. 472). She reported "doing very well" and observed that her condition had "improved greatly" since her last visit, due to her higher dose of Lithium. (R. 472). Her mental status examination was normal, and she was assessed a GAF score of 70. (R. 473).

B.   **Consultative Examination**

Plaintiff underwent a consultative examination with Glenn Bailey, Ph.D., on March 31, 2010. (R. 364-75). Dr. Bailey administered the Folstein Mini Mental Status Examination, which is a cognitive test, and Plaintiff scored a 26 out of 30. (R. 367). While her short-term memory

was poor, no other problems were noted on the Folstein examination. (R. 468). Her thought processes were normal, her thoughts were goal-directed and relevant, she did not have any preoccupations, and she denied hallucinations or delusions. (R. 368-69). Moreover, she was found to have average intelligence, but inconsistent impulse control and questionable social judgment. (R. 369). Based on his examination, Dr. Bailey opined that Plaintiff was able to maintain her activities of daily living. (R. 371). He also observed that her concentration appeared to be good during the interview. (R. 371). Dr. Bailey completed a mental residual functional capacity ("RFC") form, in which he indicated that Plaintiff was not restricted in understanding, remembering, and carrying out short, simple instructions; moderately restricted in understanding, remembering, and carrying out detailed instructions; and moderately restricted in making judgment on simple, work-related decisions. (R. 374). In Dr. Bailey's view, Plaintiff was also slightly restricted in interacting appropriately with the public, moderately restricted in interacting appropriately with supervisor(s) and co-workers and responding appropriately to changes in a route work setting, and markedly restricted in responding appropriately to pressures in a work setting. (R. 374).

C.  **State Agency Psychologist**

State agency psychologist, John Rohar, Ph.D., reviewed Plaintiff's file in connection with her initial application on September 30, 2011. (R. 156). Dr. Rohar opined that Plaintiff could "perform simple, routine, repetitive work in a stable environment." (R. 154). More specifically, Dr. Rohar opined that Plaintiff was not significantly limited in her ability to carry out short, simple instructions; moderately limited in her ability to carry out detailed instructions; moderately limited in her ability to maintain attention and concentration for extended periods; not significantly limited in her ability to perform activities within a schedule, maintain regular

7

attendance, and be punctual; not significantly limited in her ability to sustain an ordinary routine without special supervision; moderately limited in her ability to work in coordination with or in proximity to others without being distracted; moderately limited in her ability to make simple, work-related decisions; and moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (R. 154-55). Dr. Rohar also opined that Plaintiff was moderately limited in her ability to interact appropriately with the general public; accept instructions and respond to criticism from supervisors; and get along with co-workers and peers; however, she was not significantly limited in her ability to ask simple questions or request assistance or her ability to maintain socially appropriate behavior. (R. 155).

### B.     Procedural History

Plaintiff protectively filed applications for DIB and SSI on July 20, 2011. (R. 138, 298). Her claim was denied at the administrative level, and she subsequently filed a written request for a hearing. (R. 182). A video hearing was held on March 20, 2013, before Administrative Law Judge ("ALJ") Daniel F. Cusick. (R. 50). Plaintiff was represented by counsel and testified at the hearing, as did an impartial vocational expert ("VE"). (R. 50).

On February 4, 2013, the ALJ issued a decision, in which Plaintiff's claims for benefits were denied. (R. 35). The ALJ found that Plaintiff's obesity, attention deficit disorder, affective disorder, and borderline personality disorder constituted "severe" impairments. (R. 52). At the next step of the sequential evaluation process, however, the ALJ determined that none of Plaintiff's impairments met or equaled the criteria of any of the listed impairments – particularly Listings 12.02, 12.04, 12.06, and 12.08. (R. 53). The ALJ went on to determine Plaintiff's RFC. (R. 55). To wit, the ALJ found that Plaintiff could perform medium work and lift 50 pounds

occasionally and lift/carry up to 25 pounds frequently; stand or walk for approximately six hours in an eight-hour workday; and sit for approximately six hours in an eight-hour workday. (R. 55). However, she was "limited to simple, routine and repetitive tasks involving simple, work-related decisions with few, if any, workplace changes." (R. 55). She was also limited to occasional interaction with the public, co-workers, and supervisors. (R. 55). Relying on the VE's testimony, the ALJ then concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform: packer (60,000 jobs nationally); laundry worker (75,000 jobs nationally); and cleaner (over 1,000,000 jobs nationally). (R. 62). Thus, the ALJ held that Plaintiff is not disabled under the Act. (R. 63).

The ALJ's decision became the final decision of the Acting Commissioner on June 13, 2014, when the Appeals Council denied Plaintiff's request for review. (R. 1-4). This action followed. ECF No. 1.

### III. Legal Analysis

#### A. Sequential Evaluation Process

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1). When deciding whether a claimant is disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work that exists in significant

numbers in the national economy. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

**B.  Standard of Review**

The Act strictly limits the Court's ability to review the Commissioner's final decision. 42 U.S.C. § 405(g). "This Court neither undertakes a de novo review of the decision, nor does it reweigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, the Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

**C.  Discussion**

Plaintiff's primary argument is that the ALJ erred in finding that her combination of impairments did not meet the requirements of Listing 12.04, affective disorders, and Listing 12.06, anxiety-related disorders. In Step 3 of the sequential evaluation, the ALJ must determine whether a claimant's impairments meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. "If the impairment is equivalent to a listed impairment then [the

claimant] is per se disabled and no further analysis is necessary." *Burnett*, 220 F.3d at 119. "The burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment." *Id.* at 120 n.2 (citing *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992)).

To fall within either Listing 12.04 or 12.06, a claimant must satisfy the criteria in paragraphs A and B or paragraphs A and C of the Listings. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, §§ 12.04, 12.06. Paragraph A is a set of medical findings, and paragraphs B and C are sets of impairment-related functional limitations. *Id.* Plaintiff's argument focuses on the paragraph B criteria, which are identical for both of the listings at issue. To satisfy the paragraph B criteria, a claimant must show at least two of the following: "(1) [m]arked restriction in activities of daily living; (2) [m]arked difficulties in maintaining social functioning; (3) [m]arked difficulties in maintaining concentration, persistence, or pace; or (4) [r]epeated episodes of decompensation, each of extended duration." *Id.* §§ 12.04(B), 12.06(B).

Plaintiff first claims that the ALJ erred in finding that she failed to exhibit "marked" restrictions in activities of daily living. Under the regulations, "activities of daily living" include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." *Id.* § 12.00.C(1). In deciding whether a claimant's impairments satisfy the criteria of paragraph B, the ALJ must "assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability" and "determine the extent to which [a claimant is] capable of initiating and participating in activities independent of supervision or direction." *Id.* A "marked" limitation "means more than moderate, but less than extreme." *Id.* § 12.00(C). As the regulations explain, such a limitation "may arise

11

when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* Furthermore, a "marked" limitation is not defined "by a specific number of different activities of daily living in which functioning is impaired." *Id.* Rather, it is measured "by the nature and overall degree of interference with function." *Id.* So a claimant who performs "a wide range of activities" may still be found to have a marked limitation if she cannot perform those activities "without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.*

The ALJ found that Plaintiff had mild restrictions with regard to her activities of daily living because "she prepares meals, takes care of her cat, completes household chores such as cleaning, drives, shops in stores, watches television and is independent in personal care." (R. 53). The ALJ noted that this finding was consistent with the opinion of the state agency psychologist, Dr. Rohar. (R. 54). After a review of the record, the Court finds there is substantial evidence to support the ALJ's finding. Plaintiff, however, argues that the ALJ failed to take into account that she could only engage in these types of activities when her condition was stable, but not when she was decompensating. The Court does not agree that the ALJ erred in this regard. As the ALJ discussed throughout his decision, although Plaintiff did experience highs and lows throughout the relevant period – and required hospitalizations during her lowest points – her "condition improved significantly after her hospitalizations." (R. 59). Her consistently high GAF scores following her stints in the hospital support this conclusion. More to the point, the periods during which Plaintiff could function outnumbered her periods of decompensation, such that it was reasonable for the ALJ to conclude that Plaintiff was at most mildly restricted as to her activities

of daily living on a consistent and sustained basis.

Plaintiff also argues that the ALJ should have found that she experienced "repeated episodes of decompensation, each of extended duration," since she was hospitalized three times during the period in question for a total of 54 days. "The term repeated episodes of decompensation, each of extended duration . . . means *three episodes within 1 year*, or on average of once every 4 months, each lasting for *at least 2 weeks*." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(C)(4) (emphasis added).

After reviewing the evidence, the ALJ found that Plaintiff experienced one to two extended "episodes of decompensation." (R. 54). To be sure, it is not clear which periods the ALJ counted as "episodes of decompensation" – i.e., whether he found that the January 2011 hospitalization was the first episode and the October/November 2012 hospitalizations were, collectively, the second, or whether he considered each hospitalization separately. Nevertheless, no matter how these hospitalizations are construed, substantial evidence supports the ALJ's decision that Plaintiff did not meet the definition of "repeated episodes of decompensation." To begin with, there was a one year and nine month gap between Plaintiff's first hospitalization in January 2011 and her second and third hospitalizations in October/November 2012. In the meantime, Plaintiff's condition stabilized. Therefore, if each hospitalization is considered a separate "episode of decompensation," Plaintiff failed to establish that she suffered three such episodes within a one-year period, as is required to match the definition in § 12.04(C)(4). Furthermore, even assuming that there was no gap between hospitalizations, the requirements of § 12.04(C)(4) would still have not been met since neither Plaintiff's January 2011 hospitalization nor her first hospitalization in October 2012 lasted at least two weeks, and each time she was

released from the hospital in stable condition.[2]

Plaintiff makes a few other related arguments, which are not addressed at any particular finding made by the ALJ. These arguments merit only a brief discussion.

First, Plaintiff argues that the ALJ only considered her high GAF scores, but failed to acknowledge the periods during which her GAF scores were 50 or lower. The ALJ did not simply ignore the periods when Plaintiff had low GAF scores. Rather, the ALJ addressed Plaintiff's periods of decompensation, and the corresponding low GAF scores, but discounted them as "inconsistent with [Plaintiff's] longitudinal record that shows [she had] generally high GAF scores with treatment." (R. 59) (discussing Plaintiff's GAF score of 36 recorded on November 30, 2012, whenever she was discharged from Stairways RTFA). This was not an erroneous finding.

By the same token, Plaintiff contends that the ALJ placed too much emphasis on the records from Stairways, in which it was noted that Plaintiff was "stable" or "doing well," and too little emphasis on the periods when she could not function. Again, the ALJ did not err in this regard. He appropriately considered all of the medical evidence pertinent to Plaintiff's mental impairments and reasonably concluded that they would not totally preclude her from working. As the ALJ found, while Plaintiff did experience low points, she generally responded well to her treatments and her condition was in fact stable throughout most of the relevant period (save for those periods when she was hospitalized, which the ALJ appropriately considered).

---

2. Additionally, the Court notes that each of Plaintiff's alleged "episodes of decompensation" was seemingly precipitated by Plaintiff's failure to properly take her prescribed psychotropic medications, and her condition improved once her medication levels were stabilized. The ALJ appropriately considered these factors in determining whether Plaintiff is disabled. *See* 20 C.F.R. § 404.1520a(c)(1) ("[In evaluating mental impairments, the ALJ] will consider . . . how [the claimant's] functioning may be affected by factors including . . . medication[ ] and other treatment.").

Finally, Plaintiff argues that the ALJ placed too much reliance on the opinion of Dr. Rohar, the state agency psychologist who opined that Plaintiff retained the ability to work. Plaintiff seems to suggest that because Dr. Rohar opined that Plaintiff had not suffered any "episodes of decompensation," his entire opinion was not entitled to any weight. This is not correct. The ALJ did accord Dr. Rohar's opinion "great weight," but, contrary to Plaintiff's argument, the ALJ did not adopt Dr. Rohar's opinion in their entirety. Instead, he expressly noted that Dr. Rohar found no "episodes of decompensation" and rejected that portion of the opinion insofar as he found that Plaintiff had experienced one to two episodes of decompensation. (R. 54, 59). This, he was entitled to do. *See* S.S.R. 96–5p, 1996 WL 374183, at *4 (July 2, 1996) ("Adjudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one."). Therefore, Plaintiff's contention is without merit.

## IV. Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that she faces in seeking gainful employment. However, under the applicable standard of review and the current state of the record, the Court must defer to the reasonable findings of the ALJ and her conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly, the Court will **GRANT** the motion for summary judgment filed by the Acting Commissioner and **DENY** the motion for summary judgment filed by Plaintiff. An appropriate Order follows.

McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA ANN GREK,<br>      Plaintiff,<br><br>      v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner<br>of Social Security,<br>      Defendant. | )<br>)<br>)<br>) 1:14-CV-228 Erie<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

**AND NOW**, this 25th day of 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Acting Commissioner's MOTION FOR SUMMARY JUDGMENT (ECF No. 6) is **GRANTED**, and Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 10) is **DENIED**. The Clerk shall docket this case **CLOSED**.

                                              BY THE COURT:

                                              s/ Terrence F. McVerry
                                              Senior United States District Judge

cc:    **Barbara J Welton, Esq.**
        Email: bwelton@weltonlaw.com

        **Marshall J. Piccinini, Esq.**
        Email: marshall.piccinini@usdoj.gov

        (via CM/ECF)